### In re SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.

#### MDL 721 (RLA).

United States District Court,
D. Puerto Rico.

Sept. 11, 1992.

---

1. Based on our ruling, allowing the amended complaint would be futile.

Ralph W. Dau, Peter B. Ackerman, Sandra E. Smith, O'Melveny & Myers, Los Angeles, Cal., Andrew K. Epting, Jr., G. Trenholm Walker, Wise & Cole, Charleston, S.C., Frederick B. Lacey, Paul K. Connolly, Jr., Leboeuf, Lamb, Leiby & Macrae, Boston, Mass., Lon Harris, Harris & Green, Torrance, Cal., Deborah A. Pitts, Hancock, Rothert & Bunshoft, Los Angeles, Cal., Marcos Pérez Cruz, Virgilio Méndez Cuesta, Río Piedras, P.R., Ernesto Rodríguez Suris, Hato Rey, P.R., Raúl E. González–Díaz, A.J. Bennazar–Zequeira, Gonzalez, Bennazar & Colorado, Hato Rey, Puerto Rico, Homer L. Marlow, Marlow, Shofi, Connell, Valerius, Abrams, Lowe & Adler, Miami, Fla., Bethany Culp, B. Todd Jones, Oppenheimer, Wolff & Donnelly, St. Paul, Minn., Larry I. Gramovot, Marlow, Shofi, Smith, Hennen, Smith & Jenkins, Tampa, Fla., Adrián Mercado, Mercado & Soto, Hato Rey, P.R., Francisco J. Colón–Pagán, Old San Juan, P.R., for defendants.

## ORDER NO. 467

### DISMISSAL OF CLAIMS AGAINST THE PRE–FIRE INSURERS

ACOSTA, District Judge.

Before the Court are numerous motions[1] filed by several Dupont Entities,[2] the Plaintiffs' Steering Committee (PSC) and the Dupont Entities' Pre-fire Insurers.[3] After

Monita Sterling, Metairie, La., for plaintiffs' Steering Committee.

1. The parties have inundated the Court with more than 200 motions regarding this aspect of the litigation. With the exception of those filed by St. Paul Fire and Marine and the opposition and replies thereto submitted by the Dupont Entities, this Order shall only address the motions filed subsequent to the status conference held on April 30, 1992, at which time the Court requested that these be resubmitted consolidating the previous objections. The earlier motions are listed in the Appendix and are hereby DENIED WITHOUT PREJUDICE.

2. The Dupont Entities are defendants from the Phase I Trial consisting of approximately forty-eight (48) corporations, partnerships and individuals who allegedly owned or were responsible for the operation and/or management of the San Juan Dupont Plaza Hotel.

3. The pre-fire insurers include the following insurance companies:

California Union Insurance Company
Central National Insurance Company of Omaha
Federal Insurance Company
First State Insurance Company
Granite State Insurance Company
Highlands Insurance Company
Industrial Underwriters Insurance Company
Insurance Company of North America
International Insurance Company
Landmark Insurance Company
Pacific Employers Insurance Company
Protective National Insurance Company of Omaha
Puerto Rican American Insurance Company/Continental Insurance Co. (re-insurer)
Safety Mutual Casualty Corporation
St. Paul Fire and Marine Insurance Company
St. Paul Mercury Insurance Company

The following insurance companies also provided pre-fire coverage and have previously settled their claims with the insureds:

review and careful consideration of the matters contained therein, the Court finds that the claims against the pre-fire insurers warrant dismissal as a matter of law.

## I. BACKGROUND/INTRODUCTION

This is the third subphase of the Phase III Insurance Trials and involves the cross-claims by and between several Dupont Entities (insureds) and their respective insurers (pre-fire insurers) seeking recovery for the funds paid in settlement by the Dupont Entities as a result of the Phase I Trial. Coverage is alleged to be available for the acts of named insureds which resulted in advertising injury, property damage and personal injury to various Dupont Entities.

The various pre-fire insurers issued comprehensive general liability policies, naming one or more Dupont Entity as insureds, which expired prior to the December 31, 1986 fire at the San Juan Dupont Plaza Hotel (Hotel). The twenty-four (24) policies at issue in this subphase include both primary and excess coverage.

During the Phase I Trial, plaintiffs[4] sought to establish the derivative liability of the Dupont Entities, including Holders Capital Corp. (HCC) and its shareholders, Hotel Systems International (HSI), and HSI Reservations, for the acts and omissions of the San Juan Dupont Plaza Corporation. Utilizing the "Alter Ego Instrumentality Theory," "Enterprise Theory" and "Joint Venture/Partnership Theory," plaintiffs presented evidence to show that the Dupont Entities were the alter-ego, instrumentality and/or business conduit of the Hotel and therefore, not entitled to the protection offered by their corporate and partnership status.[5]

Evidence presented to support these theories included promotional materials such as brochures, pamphlets and business cards depicting the Hotel and/or employees of various Dupont Entities as part of the "HSI Family" or "HSI Hotel Chain," loan applications and business records alleging ownership and control of the Hotel by other Dupont Entities and evidence that the Dupont Entities were responsible for the design and/or alterations of the Hotel as well as the purchase and installation of various products. After approximately eight weeks, the Phase I Trial concluded with a settlement between the plaintiffs and the Dupont Entities in the amount of $78,000,000.00.

This particular subphase consists of claims against the pre-fire insurers by the PSC on behalf of all the plaintiffs pursuant to the direct action statute, Laws of Puerto Rico Annotated sections 2001 and 2003, and by virtue of the claims assigned by the Dupont Entities.[6] In addition, various Dupont Entities are seeking a declaration from the Court that the insurers of other Dupont Entities are obligated to indemnify them under these policies for any liability arising from the acts, omissions and/or occurrences alleged by plaintiffs and for all sums paid in settlement during the Phase I Trial as well as attorneys' fees and the "cost of suit."[7]

---

Fireman's Fund Insurance Company
Insurance Co. of the State of Pennsylvania
National Union Fire Insurance Co. of Pittsburgh, PA

**4.** Acting together with 106 products and services defendants whose liability was the subject of the Phase II Trial. *See* Pretrial Order No. 192, Appendix A (docket No. 10501), filed on June 5, 1989.

**5.** *See* Joint Pretrial Memorandum (docket No. 8728), filed on February 27, 1989, sec. III for a description of the particular claims to be tried during the Phase I Trial. *See also, infra* note 51.

**6.** *See* Third Amended Revised Master Complaint (docket No. 7593), filed on December 12, 1989,

¶ TTTTTT.11, p. 291; Fourth Amended Revised Master Complaint (docket No. 12516), filed on September 5, 1989, ¶ UUUUUU.23, p. 299; Fifth Amended Revised Master Complaint (docket No. 14606), filed on May 16, 1990, ¶ AAAAAAA.7, p. 308.

**7.** *See* Motion Requesting Leave to Amend Cross–Complaint of Hotel Systems International … (docket No. 8099), filed on February 8, 1989; Motion Requesting Leave to Amend San Juan Dupont Plaza Corp.'s Cross–Complaint and Third–Party Complaint … (docket No. 8132), filed on February 9, 1989; Amended Cross–Complaint and Third–Party Complaint for Declaratory Relief (docket No. 11939), filed on July 13, 1989; Amendment to Third–Party Complaint for Declaratory Relief (docket No. 12148),

It is undisputed that the claims pursued during this subphase are not identical to those asserted by plaintiffs against the Dupont Entities in the Phase I Trial. The Dupont Entities contend that coverage exists because their claims derive from and are a result of the plaintiffs' action in the Phase I Trial. On the other hand, the insurers assert that recovery under the provisions of comprehensive general liability/indemnity policies include only claims for indemnity and contribution for the damages incurred as a result of the underlying liability action. Therefore, they argue, since the insureds' coverage claims in the subphase are based entirely on provisions not pursued by the plaintiffs; i.e., advertising injury, property damage and personal injury, coverage is not available under these particular policies for these alleged cross-claims.[8]

Relying on similar reasoning, the insurers further allege that the plaintiffs' direct action claims must be dismissed because these claims are not identical to those pursued against the Hotel for injuries sustained as a result of the fire. In addition, they assert that the plaintiffs lack standing to pursue the claims of the insureds because there has been no assignment of claims.

Assuming, arguendo, that coverage does extend to include the types of claims pursued in this subphase and viewing the evidence submitted by the insureds and the plaintiffs as true and drawing all inferences therefrom to their benefit, it is clear from the analysis below that the action must be dismissed pursuant to Rule 56(c) of the Fed.R.Civ.P.

## II. SUBJECT MATTER JURISDICTION

The insurers contend that because complete diversity does not exist in this insurance dispute as several insureds and insurers are citizens of California,[9] and because the Phase I Trial resulted in settlement between the insureds and the PSC, the Court should order realignment of the parties and the non-federal, non-diversity insurance coverage claims should be dismissed for lack of subject matter jurisdiction.[10] The Dupont Entities allege that subject matter jurisdiction was decided when the initial pleadings were filed by plaintiffs and subsequent resolution of the Phase I Trial did not alter this Court's ancillary jurisdiction over pending third-party claims arising from the original action.[11]

The first issue is whether realignment is appropriate at this time in the litigation. Realignment should occur when no actual or substantial controversy exists between a party and its named opponents even though to do so may destroy diversity and federal jurisdiction. *American Motorists Insurance Co. v. Trane Co.*, 657 F.2d 146, 149 (7th Cir.1981) (citing *City of In-*

filed on August 8, 1989; Second Amendment to Cross–Complaint and Third–Party Complaint for Declaratory Relief (docket No. 12821), filed on October 4, 1990. Motion Requesting Leave to Amend Cross–Claimant and Third–Party Complaint for Declaratory Relief ... (docket No. 17180), filed on July 24, 1991, which expands claims against the pre-fire insurers to include breach of insurance contract, breach of implied covenant of good faith and fair dealing and breach of statutory duties under California Insurance Code § 790.03 as well as punitive, exemplary and consequential damages, is hereby DENIED. *See also,* Pre-fire Insurers' Opposition ... (docket No. 17247), filed on August 9, 1991.

**8.** Although the cross-claims of the Dupont Entities clearly assert that their claims are for indemnity, the papers subsequently filed in this action allege coverage for injuries sustained under these policy provisions which are different from those pursued by the plaintiffs against them.

**9.** In this subphase, complete diversity does not exist because the insureds, i.e. Holders Capital Corporation and Hotel Systems International as well as several insurers, are California corporations, i.e. California Union Insurance Co., Pacific Employers Insurance Co. and Fireman's Fund Insurance Co. Further, Industrial Underwriters Insurance Co.'s principal place of business is in California. Due to the ruling contained herein whereby plaintiffs' claims are dismissed, *see infra* parts IV & V, only the citizenship of the insurers and insureds are relevant to a determination of jurisdiction.

**10.** *See* Pre–Fire Insurers' Brief ... (docket No. 16723), filed on May 14, 1991.

**11.** *See* Dupont Entities' Joint Brief ... (docket No. 16710), filed on May 14, 1991.

*dianapolis v. Chase National Bank of City of New York*, 314 U.S. 63, 62 S.Ct. 15; 86 L.Ed. 47 (1941)). The facts which form the basis for realignment must have been in existence at the time the action was commenced and subsequent events will not affect jurisdiction over the parties properly aligned. *Id.*

 Although it is a well recognized axiom that the Court has a duty to look beyond the pleadings and determine the primary and controlling matter in the dispute and align the parties according to their genuine interests, *id.*, it need not take into consideration the counterclaims and cross-claims filed by defendants but only the plaintiffs' principal purpose in filing the suit. *Zurn Industries, Inc. v. Acton Construction Co., Inc.*, 847 F.2d 234, 237 (5th Cir.1988). Alignment is proper at the commencement of a suit, whereas, it is not appropriate at the final stage of a multiphase litigation. The "sorting out" of disputes that takes place in order to organize complex cases should not constitute realignment for diversity purposes. 13B C. Wright, A. Miller & Cooper, *Federal Practice and Procedure*, § 3607 (Supp.1992).

The insurers rely upon *Lowe v. Ingalls Shipbuilding, a Div. of Litton Systems, Inc.*, 723 F.2d 1173 (5th Cir.1984) to support the argument that the Court should realign the parties in this dispute. In *Lowe*, the Fifth Circuit reviewed subject matter jurisdiction, sua sponte, and found that realignment was appropriate where the plaintiffs, initially seeking redress against Owen–Corning and Litton, settled with Owen–Corning prior to the commencement of the action. As a result, plaintiffs and Owen–Corning were on one side of the dispute pursuing identical claims against the single remaining defendant, Litton, asserting the same position in opposition to each. The Circuit Court determined that is was appropriate to realign Owen–Corning as a party plaintiff, thereby, destroying complete diversity as Owens–Corning and Litton were both Delaware corporations.

 The Court finds that the facts in *Lowe* are distinguishable and, in effect, support the finding that realignment is not proper in the dispute currently before this Court. Clearly, the dispute of the fourth subphase of the final trial phase of this litigation does not represent the commencement of a suit. Furthermore, although the Phase I Trial eventually resulted in settlement, the settlement did not occur until well after the master complaint and subsequent amendments adding these insurers were filed, massive discovery completed and several weeks of trial.

 The Court finds, however, that the parties are properly before the Court pursuant to the principles of ancillary jurisdiction. Generally, the determination of diversity jurisdiction is made at the initiation of the lawsuit. *Zurn Industries, Inc.*, 847 F.2d at 236. Once subject matter jurisdiction is determined, the Court may assume ancillary jurisdiction over additional claims and/or parties without requiring an independent basis for jurisdiction. *Id.*

The insurers rely on *W.R. Grace & Co. v. Continental Casualty Co.*, 896 F.2d 865 (5th Cir.1990), as supporting this Court's lack of ancillary jurisdiction over the insurance coverage dispute. In *Grace*, the Circuit Court, sua sponte, reviewed the grounds for subject matter jurisdiction and reversed the decision of the district court finding that it abused its discretion by maintaining ancillary jurisdiction where the federal claims had been settled prior to trial and the disposition of the pending state claims were independent of the result of the initial action. The Fifth Circuit noted that considerations of judicial economy and efficiency and convenience of the litigants was not sufficient to support a finding of subject matter jurisdiction over appended state claims. *W.R. Grace & Co.*, 896 F.2d at 871 (citing *Owen Equipment & Erection v. Kroger*, 437 U.S. 365, 376–77, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1978)).

 Furthermore, when viewing whether ancillary jurisdiction exists for state claims, "the context in which the nonfederal claim is asserted is crucial." *Owen Equipment*, 437 U.S. at 376, 98 S.Ct. at 2404. Where cross-claims arise from a third-party complaint and the third-party

complaint is factually similar and depends, in part, upon the resolution of the initial action, the cross-claims are clearly ancillary and the claims may be resolved in the federal forum despite the absence of an independent jurisdictional basis. *Id.; see also, Atlantic Corp. v. United States*, 311 F.2d 907, 910 (1st Cir.1962).

The facts before the Court are easily distinguishable from those present in *W.R. Grace & Co.* litigation. It is not disputed that the underlying liability action as well as the cross-claims arise from the same set of operative facts; i.e., liability for the December 31, 1986 Hotel fire.[12] In addition, because the insureds are seeking to recover funds paid in settlement during the Phase I Trial, their claims are necessarily linked to what transpired during the Phase I Trial.

Furthermore, the complexity of the issues and the interrelatedness of the claims support the continuation of the insurance phase litigation in this forum pursuant to the principles of ancillary jurisdiction. Necessity and convenience warrant that the insureds proceed by way of cross-claims as opposed to a separate action, thereby, obviating the requirement of independent jurisdiction.

In addition, the underlying corporate and tort liability claims asserted against the Dupont Entities were not settled prior to trial[13] and considerable judicial resources were expended to accommodate the ongoing litigation[14] which had been divided into several trial phases to better serve the interests of justice and effectuate a rapid conclusion.[15] As a result, the support services structured by the Court continue to provide valuable assistance to both the Court and the parties in the ongoing disposition of issues related to this litigation.

Therefore, the Court finds that pursuant to the principles of ancillary jurisdiction, an independent basis for jurisdiction is not necessary and defendants' request that the insureds' claims be dismissed for lack of subject matter jurisdiction is hereby DENIED.

### III. NOTICE REQUIREMENT/CLAIM FILED

■ The insurers allege[16] that adequate notice of the advertising injury claims as between the Dupont Entities was not received prior to the first trial even though they were notified that advertising acts served as the grounds for the alter-ego claims pursued by the plaintiffs.[17] The in-

---

12. The insurers admit as much when they argue that the underlying claims must be retried for coverage to attach (*see* docket No. 16635, p. 4), even though they appear to take the opposite stance, i.e., that the insurance dispute is completely separate from the claims tried in the prior trial phases, in their argument regarding subject matter jurisdiction.

13. The Phase I Trial began on March 15, 1989 and ended with a settlement on May 12, 1989. As a consequence, even though the Dupont Entities were not actively involved in the Phase II Trial, the products and services defendants were allowed to present evidence showing that the Dupont Entities' acts and/or omissions were the direct/proximate cause of the plaintiffs' injuries.

14. Substantial judicial resources were expended for the creation of customized, technologically advanced courtroom and the hiring of additional judicial staff. In addition, under the direction of the Court and to assist the many parties involved in coordinating the litigation of this complex case, a Joint Document Depository was established as well as a Plaintiffs' Steering Committee Office and Liaison and a Defendants'

Committee and Liaison Office involving millions of dollars.

15. *See* Pretrial Order No. 133 (docket No. 7403), filed on December 21, 1988.

16. *See* Pre-fire Insurers' Consolidated Brief ... (docket No. 16740), filed on May 17, 1991, pp. 10–13.

17. The following facts are presented by the insurers:

1) On March 28, 1989 (docket No. 9318), HSI filed a motion to amend its cross-claims and asserted that it "has made demand for defense and indemnity under [these] policies ... [for] advertising liability arising out of the insured's advertising activities during the policy period, and which caused injury to the plaintiffs;"

2) Dupont Entities and plaintiffs settled on May 9, 1989;

3) On August 18, Insurance Co. of North America (INA) moved for judgment on the pleadings against HCC/HSI (docket Nos. 12331 and 12333); and

4) In its answer filed on September 5, 1989 (docket No. 12509), HSI/HCC asserted that

surers, without requesting any specific remedy, conclude that the advertising injury argument was "contrived ... after the Phase I settlement, in an attempt to avoid the universal authority finding no coverage under expired policies such as those now before this Court."[18] On the other hand, the PSC maintains that sufficient notice was given to the insurers.[19]

According to the following provision found in the Safety Mutual Casualty Corp. (Safety Mutual) policy, notice is required:[20]

> If a claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Corporation every demand, notice, summons or other process received by him or his representative.

Compliance with the terms of the policy, including the notice requirement, is a condition precedent to pursuing an action against the insurer.

■ Notice requirements are liberally construed in favor of the insured and substantial, rather than strict compliance, is sufficient. 44 Am.Jur.2d *Insurance* § 1352 (1982). There is no requirement that the insured also set forth any claim as to coverage. *Gerrard Realty Corp. v. American States Insurance Co.*, 89 Wis.2d 130, 277 N.W.2d 863, 870 (1979). Rather,

the main purpose of the notice requirement is to provide the insurers with an opportunity to investigate the claim in order to evaluate potential liability prior to when the obligation to pay arises in order to protect itself from fraudulent or exorbitant claims. 13A George J. Couch et al., *Couch on Insurance* §§ 49:2, 49:37 (2d ed. 1982), 44 Am.Jur.2d, *supra* § 1323. *Goodwin v. Nationwide Insurance Co.*, 104 Idaho 74, 656 P.2d 135, 142 (1982). As long as the notice alerts the insurer to the accident/event, sets forth the essential facts upon which liability is sought and appears credible, it is adequate.[21] 44 Am.Jur.2d *supra* § 1352.

The Court finds the record replete with communications that served to provide the insurers with constructive notice of possible liability for advertising and property damage claims. For example, on May 19, 1988, the Dupont Entities forwarded a notice of claim to all insurers stating that "[p]laintiffs' claims arise out of alleged negligent acts which took place during the period of your policy ... includ[ing] purported negligent construction, negligent management and negligent installation of hazardous material in the hotel ... which proximately caused bodily injury to the plaintiffs."

In a second letter dated February 6,

---

other Dupont Entities had maintained advertising injury claims against them based on misrepresentations made during the policy period and these cross-claims exist by virtue of the automatic cross-claims deemed filed pursuant to Order Nos. 25 & 32.

18. *See* docket No. 16740, p. 13.

19. *See* PSC Brief ... (docket No. 16808), filed on May 24, 1991, pp. 22–25. Although this brief is submitted by the PSC and the PSC claims are being dismissed pursuant to the findings herein, *see infra* Parts IV & V, since counsel for plaintiffs and the Dupont Entities shared responsibility for addressing the various issues arising from the Status Conference, the Court will treat plaintiffs' arguments as submitted on behalf of the Dupont Entities.

20. Throughout the various arguments, the PSC relies upon the definitions and provisions of the Safety Mutual policy (No. UM 23075 CA) issued on December 31, 1984, and expiring on Decem-

ber 31, 1985, contending that this underlying policy provides the initial level of coverage and the excess policy layers follow the language contained therein. *See* docket No. 13562, filed on January 10, 1991, p. 16 and docket No. 16808, filed on May 24, 1991, p. 6.

21. The application of California law would require the insurers to demonstrate that the insured's breach of the notice clause resulted in actual and substantial prejudice. *Campbell v. Allstate Insurance Co.*, 60 Cal.2d 303, 32 Cal. Rptr. 827, 384 P.2d 155 (1963). In order to meet this requirement, the insurer must show that the outcome of the underlying liability action would have been different, i.e. that the result could have been avoided had proper notice been provided. *Clemmer v. Hartford Insurance Co.*, 22 Cal.3d 865, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978); *Samson v. Transamerica Insurance Co.*, 30 Cal.3d 220, 178 Cal.Rptr. 343, 636 P.2d 32 (1981).

1989,[22] the Dupont Entities stated that "claimants' theories ... have centered around advertising activities engaged in by your insureds during the ... policy period ..." and, "[y]our policy provides coverage for advertising liability and indicates that the company will pay damages for unfair competition committed or alleged to have been committed in any advertisement ... and arising out of the named insureds' advertising activities." The insureds also provided details of the evidence to be presented at the Phase I Trial that was scheduled to begin on March 15, 1989.

The letters sent to the insurers by the Dupont Entities prior to the actual litigation properly identified the type of injury for which coverage was sought pursuant to the terms of the pre-fire insurance policies and notified them of the supporting evidence expected to be presented by plaintiffs. The information provided was more than sufficient to trigger the insurers' duty to investigate possible coverage scenarios despite the Dupont Entities' failure to accurately classify the claims as between the Dupont Entities rather than based on the plaintiffs' claims against them.

Furthermore, the complex nature of this litigation involving many parties and the application of complicated legal theories generated an intricate web of cross-claims and counterclaims. This fact is best articulated by the following statement made by counsel for the Dupont Entities at the Status Conference:

> ... Mr. Dau says our [February 6, 1989] letter doesn't say anything about one Dupont defendant harming the other. This was before the alter ego trial. We were not in the habit of sending tender letters to anyone saying our clients are guilty. What we were in the habit of

doing is what is required, to send tender letters to the insurance company and say claimants have suggested that they have been damaged under a certain clause and that is going to cause problems and it triggers coverage.

> It's not surprising that we did not send them a tender letter saying, guess what, Mr. Dau, we lied when we said X and we know that various Dupont defendants are going to have claims against one another when this is all over. That is no [sic] what is required.

Transcript of the April 30, 1991 Status Conference, at 33–34.

There is no doubt that a more detailed description of the nature of the cross-claims would have been contrary to the Dupont Entities' defense in the Phase I Trial. The Dupont Entities' failure to specifically indicate that the cross-claims were between the various Dupont Entities was in the best interest of their insurers.

Accordingly, the Court finds that the pre-fire insurers were provided with adequate notice which was in compliance with the terms stated in the insurance policy.

## IV. PSC'S DIRECT ACTION CLAIMS

The insurers allege that the PSC has abandoned any claims pursuant to the direct action statute[23] because of plaintiffs' admission that they "are not asserting a claim against the pre-fire policies for their individual personal injuries" but "[p]rimarily basing their claim against the pre-fire insurers on the advertising injury incurred by the Dupont Family Defendants which subjected these Defendants to derivative liability."[24] In another submission,[25] plaintiffs maintain that they have a direct action claim based on 26 L.P.R.A. § 2003(2).[26]

---

**22.** The insurers conceded that they received this second letter. *See* Transcript for the April 30, 1991 Status Conference, at 31.

**23.** *See* Pre-fire Insurers' Brief on PSC's Lack of Standing ... (docket No. 16722), filed on May 14, 1991.

**24.** *See* PSC's Opposition to Insurers' Defendants Motion to Dismiss Fourth Amended Complaint (docket No. 13562), filed on January 10, 1990, p. 19.

**25.** *See* PSC Motion re: Underlying Liability Trial ... (docket No. 16596), filed on April 30, 1991.

**26.** Title 26 L.P.R.A. § 2003(2) reads, in pertinent part:

> If the plaintiff in such an action brings suit against the insured alone, such shall not be deemed to deprive him of the right, by subrogation to the rights of the insured under the policy, to maintain action against and recover

The direct action statute provides an injured party with a separate and independent cause of action against the insurer for torts committed by the insured where such acts are covered under the insurance policy. *Fraticelli v. St. Paul Fire and Marine Insurance Co.*, 375 F.2d 186 (1st Cir. 1967); *Trigo v. The Travelers Insurance Co.*, 91 P.R.R. 843 (1965). A direct cause of action as provided for under the statute merely permits an injured party to pursue the identical cause of action it has against the insured directly against the insurer. *Ruiz Rodríguez v. Litton Industries Leasing Corp.*, 574 F.2d 44 (1st Cir.1978).

In order to sustain direct action claims against the pre-fire insurers, the plaintiffs' claims must mirror those pursued against the insureds in this action. By the plaintiffs' own admission, they are seeking damages for the economic injuries to the Dupont Entities which are alleged to arise from advertising injury, property damage and personal injury claims. Because plaintiffs never sought damages under these theories, the PSC's direct action claims against the pre-fire insurers must be and are hereby DISMISSED.

## V. PSC'S STANDING AND ASSIGNMENT OF CLAIMS

The PSC's contention that the plaintiffs have standing to assert claims against the insurers is based on two premises: 1) the "general rule ... that an injured party has standing in insurance coverage litigation" and 2) "in this case, Plaintiffs have a contractual right to a fixed percentage of the insurance proceeds under the settlement agreement." [27]

from the insurer after securing final judgment against the insured.

27. *See* PSC's Brief re: PSC Standing ... (docket No. 16724), filed on May 14, 1991, p. 1.

28. The insurers argue that the agreement between the PSC and Dupont Entities to share the proceeds is tantamount to *res inter alios acta, aliis nec nocet nec prodest* ("something which is an act among others does not prejudice nor benefit those who are not parties to that act") and concludes, after a rather expansive discussion about contract law, that such an arrange-

No specific grounds were cited by the PSC in support of the first point; rather, it appears that the PSC is relying on its alleged direct action claims as sufficient to confer standing. Since the Court found that the PSC's claims pursuant to the direct action statute against the pre-fire insurers have no basis in law, the plaintiffs' first standing argument must fail.

■ Alternatively, the PSC argues that standing is conferred by the terms of the settlement agreement entered into at the conclusion of the Phase I Trial which created a "personal stake in the outcome of the controversy" because the proceeds of subsequently pursued lawsuits against the insurers are to be shared between the insureds and the plaintiffs. The issue before the Court is whether the terms of the settlement agreement are sufficient to confer standing to the PSC for pursuit of claims against these insurers.[28]

Prior to discussion, it is prudent to highlight several pertinent portions of the settlement agreement from the Phase I Trial, currently sealed,[29] which affect this issue.

The following excerpt sets forth the PSC's responsibilities in the pursuit of the claims against the pre-fire insurers:

The PSC and Dupont Defendants agree to provide one another with reasonable good faith cooperation ... in the prosecution or defense of claims against or asserted by the ... insurance carriers....

Settlement Agreement, May 9, 1989, at 14 & 20.

In return for the PSC's cooperation, the proceeds derived from any action involving the pre-fire insurers would be divided be-

ment does not give the PSC any rights against these insurers or constitute an assignment. *See* docket No. 16722, filed on May 14, 1991. The Court need not consider this analysis in order to resolve these outstanding claims.

29. The settlement agreement contains 161 pages and involves numerous agreements among and between 85 parties and the PSC. Because its contents are sealed, confidentiality shall be maintained as to the remaining portion of the agreement.

tween the PSC and the Dupont Entities according to the following provision:

> In the event that it is judicially determined that any of the foregoing policies are applicable, or, in the alternative, a settlement is entered into with any of the insurers, the proceeds obtained shall be divided as follows:
>
> The gross proceeds recovered by the Dupont Defendants or the PSC only, minus costs, from and only from said insurers ... shall be divided between the PSC and the Dupont Defendants....

Settlement Agreement, May 9, 1989, at 14.

Finally, the settlement agreement provides for the sharing of proceeds only after, it is presumed, reasonable good faith cooperation was furnished. It does not include an assignment of the claims of the Dupont Entities against their insurers to the PSC[30] as clearly indicated by the provision below:

> The Dupont Defendants shall transfer, convey and assign to the Plaintiffs, through the PSC, any claims arising as a result of the Dupont fire, except that the Dupont Defendants **do not** assign transfer, convey, release, waive or discharge any claims to recover damages paid by Claimants under this Settlement Agreement ... that they may have against any insurance company....

Settlement Agreement, May 9, 1989, at 18 (emphasis added).

Constitutional and prudential limitations upon the exercise of federal jurisdiction are subject of the standing doctrine. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In order to maintain that a party has standing, the initial requirement is the constitutional minimum that an Article III case and controversy exists thereby establishing that the federal court has the power to hear the suit. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Thereafter, the injured party must show that the dispute warrants the plaintiff's invocation of federal jurisdiction to justify the court's exercise of remedial powers on plaintiff's behalf, i.e., that plaintiff is best to assert a particular claim. *Id.; Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 2970, 86 L.Ed.2d 628 (1985).

Accordingly, plaintiff must show that an injury in fact exists and that plaintiff's injuries " 'fairly can be traced to the challenged action of the defendant,' or put otherwise, that the exercise of the remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978) (quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)). Therefore, it is required that proof of an injury be presented, that a causal connection between the injury and the acts exists and that the law seeks to protect against that type of injury. *Muñoz–Mendoza v. Pierce*, 711 F.2d 421, 424–25 (1st Cir.1983).

Plaintiff has the ultimate burden of proving that an injury in fact resulted from defendants' acts. *N.A.A.C.P., Boston Chapter v. Harris*, 607 F.2d 514, 526 (1st Cir.1979). Where the injury and causation element for purposes of standing are not clear, plaintiff must plead such with specificity in the complaint, or, upon leave granted, supplement and/or amend the complaint with additional facts. Thereafter, in the event that the entire record is inadequate to support plaintiff's standing, the action must be dismissed. *Warth*, 422 U.S. at 501, 502, 95 S.Ct. at 2206, 2207.

As indicated by the claims asserted by the plaintiffs in this litigation, injuries are not alleged to have resulted from the prefire insurers' activities which serve as a basis for advertising liability, property damage or personal injury claims pursued by the Dupont Entities. Although the plaintiffs may have an economic interest in the outcome of the litigation arising from their proceed-sharing agreement with the

---

**30.** *See also,* Transcript of the April 30, 1991 Status Conference, at 40–41 and docket No. 16724, p. 6.

Dupont Entities, this interest in and of itself does not represent an injury in fact. Because plaintiffs have failed to establish any controversy justifying the Court's intervention on their behalf, the Court finds that plaintiffs do not have standing to pursue claims in this subphase of litigation against the pre-fire insurers. Accordingly, all outstanding claims filed by the PSC against the pre-fire insurers are hereby DISMISSED.

## VI. COVERAGE [31]

### A. Policy Interpretation

 The insurance policy is essentially a contract between the insurer and the insured(s) and the terms shall be defined in accordance with the general principles of contract law. *Walters v. Marler*, 83 Cal.App.3d 1, 147 Cal.Rptr. 655, 675 (1978). The terms of the policy must be interpreted according to the parties' purpose and intent. *International Surplus Lines Ins. Co. v. Devonshire Coverage Corp.*, 93 Cal.App.3d 601, 155 Cal.Rptr. 870, 874 (1979), 2 Couch, *supra* § 15:10 (1984).

 To fairly determine the intent of the parties as to the scope and subject matter of the policy, the insurance contact shall be considered in its entirety giving effect to all provisions. *Sampson v. Century Indemnity Co.*, 8 Cal.2d 476, 66 P.2d 434, 436 (1937), 2 Couch, *supra* § 15:29. The Court must enforce the contract as written without adopting a strained construction as it has no authority to go beyond in an attempt to alter or change the policy. *Atlas Assurance Co. Ltd. v. McCombs Corp.*, 146 Cal.App.3d 135, 194 Cal.Rptr. 66, 74 (1983), 2 Couch, *supra* §§ 15:4, 15:38. Clear and unambiguous terms of an insurance contract shall be construed according to their ordinary and popular meaning without favoring any par-

ty in the determination. 2 Couch, *supra* § 15:17.

Where a question of construction or effect of a written contract of insurance exists and where the issue is not dependent upon disputed facts or extrinsic evidence, the resolution is within the province of the Court and not the jury. 2 *id.* § 15:3. Insurance contracts are to be construed according to uniform standards and where terms have been defined through judicial construction, these definitions should be followed. 2 *id.* Where there has been judicial interpretation of the words and terms used in the policy prior to its issuance, it is assumed that the parties have adopted such constructions. 2 *id.* § 15:20.

 The interpretation of an ambiguous or unclear policy provision in an insurance contract written by the insurer must be construed in favor of the insured and against the insurer given the unequal bargaining strength which permeates the insured-insurer relationship. *Ponder v. Blue Cross of Southern California*, 145 Cal. App.3d 709, 193 Cal.Rptr. 632, 636 (1983); *Reserve Insurance Co. v. Pisciotta*, 30 Cal.3d 800, 180 Cal.Rptr. 628, 631, 640 P.2d 764, 767 (1982), 2 Couch, *supra* § 15:74. Where the contract provisions can be interpreted to reflect differing intents, the reasonable expectations of the insured shall be controlling. *Harris v. Glenn Falls Insurance Co.*, 6 Cal.3d 699, 100 Cal.Rptr. 133, 493 P.2d 861, 862 (1972), 2 Couch, *supra* § 15:14.

In California, an insurance policy term is ambiguous when two or more reasonable definitions/interpretations could apply. *Delgado v. Heritage Life Insurance Co.*, 157 Cal.App.3d 262, 203 Cal.Rptr. 672, 677 (1984). The California courts have identified policies as ambiguous where a word or phrase contained in the policy can be interpreted as having more than one meaning, *Gyler v. Mission Insurance Co.*, 10 Cal.3d

---

**31.** It should be noted that the issue of which law to apply in this subphase was briefly discussed at the Status Conference on April 30, 1991. Counsel speaking for the PSC and, presumably, for the Dupont Entities stated that California law is applicable to all issues in this subphase. The insurers, on the other hand, articulated

their position that no conflict of law exists between the various jurisdictions on the matters currently before the Court which, therefore, obviates the need for a choice of law analysis. *See* Transcript of the April 30, 1991 Status Conference, at 79–81.

216, 110 Cal.Rptr. 139, 140, 514 P.2d 1219, 1220 (1973); where policy provisions are inconsistent; and, where the policy contains hidden or inconspicuous terms, *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263, 54 Cal.Rptr. 104, 110, 419 P.2d 168, 174 (1966).

### B. Summary Judgment Standard

It appearing that the parties have availed themselves of the opportunity of embellishing the factual underpinnings of these claims and have submitted additional documentation other than the pleadings, the Court will treat the motions submitted as requests for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

Summary judgment is proper where there is no genuine issue of material fact; it is not warranted where the Court finds that an actual dispute about a material fact exists, i.e. where the jury could find a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In its determination, the Court may not weigh the evidence or determine the truth of the matter. Evidence presented by the nonmoving party shall be believed and all inferences shall be drawn therefrom to the nonmoving party's benefit. *Id.*

Entry of summary judgment is warranted where the nonmoving party has failed to make a sufficient showing, necessary to establish an essential element of its case and for which it has the burden of proof at trial. In effect, the failure to sufficiently support an essential element of its claim renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### C. Advertising Liability Claims

■ The Dupont Entities are cross-claiming each other and their insurers for advertising injuries allegedly suffered as a result of their promulgation of promotional material representing the Hotel as a member of the "HSI Family" and/or "HSI Chain of Hotels." This material was distributed by the San Juan Dupont Plaza Corporation, HSI and HSI Reservations from 1978 through 1986 and included promotional material in yellow page listings, newspaper publications, press releases, direct mailings to travel agencies, advertisements and postings in travel and lodging trade publications, logos on letterheads and various items distributed throughout the eight hotels serviced by HSI and HSI Reservations as well as erroneous financial information on loans and other business documents.

The insureds allege that the aforementioned advertising acts were the "evidentiary linchpin" [sic] of the alter-ego theory in the Phase I Trial which persuaded the Dupont Entities to fund a large portion of the settlement with their own assets. In addition, the Dupont Entities allege that as a result of the sizable settlement, they incurred substantial economic losses due to the disruption of their businesses activities.[32]

The pertinent policy provision in the Safety Mutual policy[33] which defines advertising injury is as follows:

> "Advertising Injury" means libel, slander, defamation, infringement of copyright, title or slogan, piracy, unfair competition, idea misappropriation or invasions of rights of privacy, arising out of the Insured's advertising activities.

Although it is clear that the policies at issue do provide coverage for injuries resulting from advertising acts, an issue remains as to what constitutes the necessary triggering event for advertising injury claims. The following provision appears in the Safety Mutual policy:

> "Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in *personal injury* or *property damage* neither expect-

---

**32.** *See* docket No. 13562, filed on January 10, 1990, p. 26.

**33.** The insureds chose to focus exclusively on the wording of the policies in effect during 1985 which includes the primary policy issued by Safety Mutual and twelve (12) excess policies which follow its terms. *See* docket No. 13562, pp. 26–27 and *supra* note 20.

ed nor intended from the standpoint of the Insured. (emphasis added).

■ Generally, for coverage to be triggered in an occurrence policy, the act as well as the resulting damage or injury must occur during the policy period.[34] However, because the definition of occurrence in the Safety Mutual policy does not encompass advertising injury, it can be argued that the injury resulting from the advertising act need not occur during the policy period; or, alternatively, that the act itself constitutes an injury. Therefore, the insureds conclude, the terms of the policies create an ambiguity which must be resolved in their favor.[35]

In support of this proposition, the insureds submitted two expert witnesses' affidavits. Both contend that the most reasonable interpretation of the policy terms as written is that coverage for advertising injuries is triggered by the advertising activities themselves and that coverage is available as long as these acts occurred during the policy period regardless of when the effects or injuries stemming therefrom materialize.[36]

Relying on case law from thirty-five jurisdictions as well as Puerto Rico and California, the insurers allege that in order for coverage to exist in an occurrence policy, both the act and the injury must occur within the policy period. Identifying the Hotel fire on the evening of December 31, 1986 as the triggering event, the insurers allege that coverage is not available because at the time of the occurrence the pre-fire policies at issue had already expired.[37] The insurers fail to address the argument that a separate occurrence other than the advertising activity itself is not necessary to trigger advertising liability coverage due to the omission of "advertising liability" in the occurrence definition of the policy.

Accordingly, the Court finds that even though this is an occurrence policy, the fact that advertising injury is not listed in the definition of occurrence renders the policy term ambiguous. The insureds' interpretation, as indicated by the expert witnesses, is reasonable as it clearly falls within the meaning of the provisions contained in the policy. Therefore, construing the provision in a light most favorable to the insured, the Court will not construe the occurrence provision as limiting coverage for advertising acts which occurred during the policy periods.

■ Next, we turn to the determination of whether the Dupont Entities' promotional activities constitute an "advertising injury" as defined by the Safety Mutual policy under examination. The Dupont Entities allege that the aforementioned dissemination and publication of erroneous information is tantamount to "unfair competition" which falls squarely within the definition of advertising injury, thereby, triggering advertising liability coverage.[38] They further contend that the term "unfair competition" as used within the policy is ambiguous[39] as it is reasonable to apply

**34.** See discussion infra Part VI(D).

**35.** See PSC Brief on Advertising Injury ... (docket No. 16808), filed on May 21, 1991.

**36.** Attached to the PSC Opposition ... (docket No. 13562), filed on January 10, 1990, are the affidavits of Donald Malecki and Alan I. Widiss, Esq. Mr. Malecki states, in part, "it is my opinion that the proper interpretation of the triggering event under the Safety Mutual policy is that coverage for advertising liability is triggered by an act, including but not limited to a publication, during the term of the policy and forms a basis for the underlying action involving the insured [since] ... the definition of advertising injury, as it appears in the Safety Mutual policy, focuses on the type of offense committed rather than the type of injury. Generally, advertising injury is defined to mean 'injury' which results from the offenses of libel, slander, etc. Based upon this, it appears that the act of publication rather than the result is the triggering event for advertising liability coverage. There is no requirement in the policy that resulting damage must occur or manifest itself during the coverage period." Professor Widiss essentially corroborates Mr. Malecki's conclusions.

**37.** See Pre-fire Insurers' Consolidated Brief on Advertising Injury ... (docket 16740), filed on May 17, 1991.

**38.** See docket No. 16808, pp. 18–21.

**39.** The insureds suggest that the insurers have admitted that the definition of advertising liability is ambiguous; see Transcript of April 30, 1991 Status Conference, at 51. This statement was made during an argument in support of additional discovery and does not constitute a party admission.

both the common law definition of the term, as well as the more expansive definition provided by California Business & Professions Code § 17200 (formerly Cal.Civ. Code § 3369(3)).[40]

According to the insurers, the term is not ambiguous when viewed within the particular facts of this case.[41] They contend that in California, the broad statutory definition of unfair competition has only been applied where the injured in the underlying action were defrauded consumers. Since the parties to this action are business entities, they argue, the common law tort definition must be applied. Moreover, when the common law meaning is applied, the claim fails because a competitive injury has not occurred.

The insureds' argument is supported by a recent California decision whereby the Court found that advertising liability coverage could potentially be triggered by the acts identified as unfair competition pursuant to the statutory definition.[42] (Cal.Bus. & Prof.Code § 17200) *Keating v. National Fire Insurance Co. of Pittsburgh, Pa.*, 754 F.Supp. 1431, 1435 (C.D.Cal.1990).[43] In *Keating*, banking officers and directors of Lincoln Savings and Loan Association and American Continental Corporation were seeking a declaration that its insurer was obligated to provide a defense in the underlying action where plaintiffs claimed that advertising injuries were sustained as a result of their fraudulent representations that the bonds purchased were guaranteed by the full faith and credit of the United States Government. The *Keating* Court found that the definition of advertising liability was ambiguous and construing the

ambiguity in the light most favorable to the insured, the Court found that the allegations in the underlying action created a potential liability under the terms of the policy and, therefore, the insurers had a duty to defend.

Although the *Keating* Court went to great lengths to justify its conclusion that it was reasonable to apply the statutory definition of unfair competition to advertising liability in an insurance context, it can be readily distinguished from the facts present in the case at bar. Case law, as well as common sense, dictate that the expansive definition of unfair competition as provided by the California statute, designed to protect consumers, is not a reasonable construction where the parties to the action are not consumers or the general public. *See e.g., The People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App.3d 509, 206 Cal.Rptr. 164, 177 (1984) ("[n]o California court has yet defined in this setting the parameters of the term 'unfair business practice' [within the Business and Professions Code section 17200] ... [w]e conclude that an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers"); *see also, Barquis v. Merchants Collection Association of Oakland, Inc.*, 7 Cal.3d 94, 101 Cal.Rptr. 745, 496 P.2d 817, 828 (1972) ("[a]lthough in a commonlaw [sic] context, competitive injury originally composed an essential element of the tort of 'unfair competition,' the Legislature, by adopting Section 3369, broadened the scope of legal protection against business practic-

---

**40.** The California statute defines unfair competition as, *inter alia:*

> unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising....

**41.** *See* docket No. 16740, pp. 14–19.

**42.** In their discussion, the insureds also include two other cases which have found that the definition of unfair competition, as provided by California Unfair Business Practices Act, was reasonable within the context of advertising liability. *See In re Technical Equities Litigation,* Master File No. 1991 (Cal.Sup.Ct.) and *Bank of*

*the West v. Superior Court (Industrial Indemnity Co.),* 225 Cal.App.3d 121, 275 Cal.Rptr. 39 (1990) *reh'g granted* 279 Cal.Rptr. 777, 807 P.2d 1006 (1991). However, California law restricts reliance upon the first case as representative of the state of the law; *see* California Rules of the Court, section 977(a) and docket 16740, n. 6. As to the second case, the Supreme Court of California recently reversed the lower court's decision; *see* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992) and discussion *infra,* p. 640 and note 44.

**43.** *See* docket No. 16808, p. 20.

es generally, and in so doing extended to the entire consuming public the protection once afforded to only business competitors"). Because the intent and purpose behind the enactment of this statute was to protect against all unfair business acts which tended to deceive members of the public, the application of the statutory definition in this instance is contrary to the intent and purpose of the statute. Furthermore, there is no justification for utilizing a consumer protection statute in an insurance dispute involving injuries sustained by business partners. Even where unfair competition is equated with the term "commercial unfairness," as provided by state statutes, the misappropriation of another's commercial advantage remains essential to the cause of action. *Dior v. Milton,* 9 Misc.2d 425, 155 N.Y.S.2d 443, 455, *aff'd,* 2 A.D.2d 878, 156 N.Y.S.2d 996 (N.Y.App. Div.1956) ("[t]he modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality"). The complained-of acts in this case were intended to and did produce the exact opposite result; they were specifically designed and carried out to collectively enhance the commercial advantage of all the entities involved rather than to misappropriate one another's commercial advantage.

This ruling is supported by the findings of the Supreme Court of California in its recent decision on the subject which states, in no uncertain terms, that the Unfair Business Act may not be used to define conduct giving rise to advertising liability insurance coverage. *See Bank of West v. Superior Court (Industrial Indemnity Co.),* 2 Cal. 4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545 (Cal.1992). In *Bank of West,* the Court found that the type of damage allowed by the statute, i.e., "disgorgement of money that has been wrongfully obtained," is not insurable. To find that insurance exists for the possible return of money or property wrongfully attained, the Court notes, would be contrary to public policy as the violator would simply shift the loss to the insurer while retaining the fruits of the unfair business practice, thereby eliminating any incentive for obeying the law.

Furthermore, prior to the issuance of the *Bank of West* decision, other California Courts have consistently held that the term unfair competition, as used within an insurance policy, is not ambiguous and that the application of the common law definition is proper when coverage for advertising injury liability is sought.[44] Thus, the Court, in *Nationwide Mutual Insurance Co. v. Dynasty Solar, Inc.,* 753 F.Supp. 853, 856–57 (N.D.Cal.1990) found that when the meaning of unfair competition is considered within the context of the insurance contract and the contract is read in its entirety, it is not ambiguous. It would not be reasonable to apply the broader statutory definition to the term because it is listed with a number of common law torts and the application of the broader definition would encompass several torts listed, resulting in surplusage.

In addition, the Court in *Trigera Group, Inc. v. Commerce and Industry Insurance Co.,* 753 F.Supp. 858, 860 (N.D.Cal. 1991) found that "[t]here is no indication that the purpose of the consumer protection language in California Business and Professions Code section 17200 was to overrule the common law definition of 'unfair competition' as the phrase is used in insurance policies." The Court refused to consider the statutory definition as reasonable and, thereby, denied any ambiguity. *See also, Westfield Insurance Co. v. TWT, Inc.,* 723 F.Supp. 492 (N.D.Cal.1989).

**44.** In its *Bank of West* decision, the California Supreme Court stated that the *Keating* decision, relied upon by the plaintiffs and the Dupont Entities, was in direct conflict with prevailing authority in the Ninth Circuit as well as in other jurisdictions where the common law definition of unfair competition was found applicable within the context of an insurance policy rather than broader definitions as provided by state statutes. *See Bank of West v. Superior Court (Industrial Indemnity Co.),* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 544, 833 P.2d 545, 551 (Cal. 1992).

Other jurisdictions have continued to apply the common law definition of unfair competition within the context of an insurance policy despite the expansion of the term by state statute to include any fraudulent business practice or consumer fraud. *See, e.g., Globe Indemnity Co. v. First American State Bank,* 720 F.Supp. 853 (W.D.Wash.1989) *aff'd,* 904 F.2d 710 (9th Cir.1990); *Pine Top Insurance v. Public Utility District No. 1 of Chelan County,* 676 F.Supp. 212 (E.D.Wash.1987); *Ruder & Finn Inc. v. Seaboard Surety Co.,* 52 N.Y.2d 663, 439 N.Y.S.2d 858, 422 N.E.2d 518 (N.Y.1981); *Seaboard Surety Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.,* 81 Wash.2d 740, 504 P.2d 1139 (1973).

Faced with these noteworthy precedents, the Court is not swayed to construe the analysis in the *Keating* decision as supporting the application of the broad statutory definition of unfair competition in advertising injury actions. Even if the facts here were similar, the Court would be hard-pressed to rely on the *Keating* decision as supporting this proposition. The issue there was whether a duty to defend existed which merely requires a determination that potential coverage exists for advertising injuries alleged; it is well established that under California law, an insurers' duty to defend is far broader than its duty to indemnify. *See Gray v. Zurich Insurance Co.,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 111–113, 419 P.2d 168, 175–77 (1966).

 The Court finds that the term unfair competition as used within this particular policy is not ambiguous and, therefore, refrains from expanding the definition to include the broad spectrum of unfair business practices as provided by the California statute. Applying the common law definition of unfair competition to the advertising claims presented here requires their dismissal. The common law tort of unfair

competition is intended to provide protection for businesses from the misappropriation of its "organization [and] expenditure of labor, skill and money" by another for their advantage. *International News Service v. Associated Press,* 248 U.S. 215, 239, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918). An action for unfair competition lies where a competitive injury occurs, i.e. "palming off one's goods as those of a business adversary or passing off a competitor's product as one's own," *Nationwide Mutual Insurance Co.,* 753 F.Supp. at 855 (citing *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 531–32, 55 S.Ct. 837, 844, 79 L.Ed. 1570 (1935)), as well as when the commercial advantage of one is misappropriated by another for its own use and profit, *Macsweeney Enterprises v. Tarantino,* 106 Cal.App.2d 504, 235 P.2d 266, 271 (1951); *Academy of Motion Picture Arts and Sciences v. Benson,* 15 Cal.2d 685, 104 P.2d 650, 652 (1940).

The Court finds that the advertising acts at issue do not constitute an advertising injury within the common law meaning of unfair competition. It is undisputed that the Dupont Entities, cross-claimants in this subphase, are a group of corporations, partnerships and individuals which own, manage and/or operate eight hotels. The advertising acts for which coverage is sought were the result of these insureds working in concert toward the common goal of promoting their related businesses.[45] Accordingly, absent the misappropriation of another's business advantage or a competitive injury, these claims must be dismissed. *Trigera Group,* 753 F.Supp. at 860.

 The Dupont Entities alternatively contend that the advertising acts create a cause of action for defamation. Although not directly addressed by the insureds in the most recent filings on advertising inju-

---

**45.** In light of this analysis, the PSC's recent argument that the *Bank of West* decision "expanded" the common law application of unfair competition to include "passing off" and "palming off" is of no consequence. *See* PSC's Supplemental Brief on Advertising Injury ... (docket No. 18085), filed on August 18, 1992. *See also*

Motion of Certain Pre–Fire Insurers ... (docket No. 18089), filed on August 26, 1992 and Safety Mutual et al.'s Joinder ... (docket No. 18091) filed on August 27, 1992. Furthermore, any additional theories of coverage belatedly raised by the PSC in their motion will not be entertained by the Court.

ry,[46] it appears as though the insureds are relying on the fact that the information contained in several business records and loan applications was misleading and untrue as to the ownership and control of the Hotel.

In order for a claim to be actionable for defamation, the advertising must have been defamatory in nature; it must "expose another to hatred, ridicule or contempt," "reflect unfavorably upon his personal morality or integrity," "discredit his financial standing in the community," "imput[e] certain physical and mental attributes such as disease or insanity," or "deter third persons from associating with the person so characterized."[47] Furthermore, an action for defamation of a corporation must occur under the following circumstances:

> One who publishes defamatory matter concerning a corporation is subject to liability to it ... (a) if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it ...

Restatement (Second) of Torts § 561 (1977).

The commentary following the above excerpt indicates that a corporation's business reputation is said to be defamed when the communications discredit it and cause loss to it in the conduct of its business. Using this rationale, the insureds attempt to equate the statements filed by the Dupont Entities in credit applications and other financial transactions, wherein they falsely represent their ownership of the Hotel, as acts which "impugn the basic integrity or creditworthiness of a business" quoting *Ruder & Finn*, 422 N.E.2d at 522.[48]

Lacking a clear presentation of this claim, it appears as though the insureds are confusing the publication of falsehoods with defamation. Yet, for a communication to be considered defamatory, it must "harm the reputation of another ... lower him in the estimation of the community or deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). As previously discussed, the alleged promotional material were aimed at bolstering the business of the Hotel and its interrelated corporate entities even though it contents may have been untrue and/or misleading. While these materials may have been used by the plaintiffs in their attempt to pierce the corporate veil, there is no evidence before the Court to indicate that the business reputations of the various Dupont Entities were adversely affected therefrom.

In light of these findings, all claims for advertising injuries raised by the various Dupont Entities are hereby DISMISSED.

### D. Property Damage Claims

The various Dupont Entities had a total of twenty-three (23) policies during 1978 through 1985 providing coverage for property damage. Presently before us are the cross-claims instituted amongst the Dupont Entities and against their respective insurers demanding indemnification for monies paid to plaintiffs in settlement of the Phase I Trial. In support thereof, the Dupont Entities contend that there was property damage to the Hotel recoverable by them under these policies since the modifications to the Hotel, the lack of adequate fire prevention equipment, as well as the products with which it was furnished rendered the Hotel unsafe for its intended use.[49]

Although the insureds allege that the claims in this subphase are derivative of the Phase I Trial, most of the property damage claims listed in the insureds' briefs

---

46. In an earlier filing, there is a general discussion of this claim; *see* docket No. 13562, filed on January 10, 1990, pp. 40–44, 48–52.

47. *See* docket No. 16740, p. 19, citing Restatement (Second) of Torts § 559 comts. (b) & (c) (1977).

48. *See* docket No. 13562, p. 50.

49. *See* Memorandum of Dupont Defendants Articulating Property Damage Claims ... (docket No. 16695), filed on May 10, 1991. The insureds assert that "property damage caused by one or more of the Dupont Defendants rendered the Hotel unsafe for its intended use and thereby resulted in consequential damages including but not limited to, the deaths and personal injuries of the plaintiffs herein," p. 11.

appear dependent upon a finding of liability in the Phase II Trial involving products and services providers.[50] For example, the insureds claim that property damage occurred when the Dupont Entities purchased and installed hazardous supplies, equipment and furnishings, i.e., wallcovering, carpeting, fixtures, thereby rendering the Hotel unsafe for its intended use. The question of liability in relation to these products was the primary issue of the Phase II Trial. Nonetheless, the Dupont Entities contend that had Phase I Trial not ended in settlement and had any product and services defendants been found liable, cross-claims for contribution would have ensued.

The evidence presented in the Phase I Trial was limited in scope to the issue of whether the corporate shield protecting the various individuals, partnerships and corporations associated with the Hotel could be pierced and liability established for the torts of the Hotel and the plaintiffs' injuries arising therefrom.[51] The insureds' property damage claims which actually relate to the evidence at issue in the Phase I Trial are limited to the design and alteration of the west door in the casino and the absence of sprinklers.

█ In support of their claims for property damage, the insureds first allege that prior rulings of this Court have established that pre-fire events occurred which resulted in plaintiffs' injuries and that such findings are somehow determinative in the cov-

erage dispute. Specifically, the insurers rely on three separate rulings; the first was issued in the Phase I Trial and concerns the definition of "occurrence" for purposes of the 1986 insurance policies, while the other two were issued during the Phase II Trial and addressed questions raised concerning intervening cause and efficient/concurrent causes.[52] In addition, the insureds, in a single broad stroke, conclude that coverage automatically exists if any of the allegations against them would have resulted in a judgment for which the insurers would have had to pay.

The Court finds that these contentions are in no way conclusive as to the issue of coverage under the terms of the pre-fire policies. The insureds are applying legal theories and analysis which, although relevant to the issues presented in prior trial phases, are not determinative in this coverage dispute.[53] Furthermore, equating judgment from the Phase I Trial in favor of the plaintiffs with coverage under expired insurance policies is totally bereft of sound legal reasoning.[54] Were the Court to rely on their flawed arguments, it would erroneously sidestep the contract analysis needed to determine coverage under the specific provisions of these policies and in accordance with the particular facts of the case.

█ As a second argument regarding these claims the Dupont Entities allege that certain terms contained in the insurance policies are ambiguous. Specifically,

---

50. *See* docket No. 16695, Appendix B and HCC, HSI and DPA's Separate Statement of Facts ... (docket No. 14140), filed on May 20, 1990, for a comprehensive listing of the particular property damage claimed.

51. Specifically, the plaintiffs were allowed to submit evidence on the following matters during the Phase I Trial: 1) failing to provide sprinklers in the public occupancy areas of the Hotel; 2) failing to provide and supervise security for employees and guests in view of the ·labor unrest at the Hotel or to otherwise warn guest of potential danger; 3) failing to provide or implement an adequate emergency evacuation plan; 4) constructing and designing a door at the west entrance of the casino that was unreasonably dangerous; and 5) failing to provide adequate fire warnings to the guests after the fire started. *See* Order Nos. 133 & 151

(docket Nos. 7403 & 8075) filed on December 21, 1988 and February 8, 1989, respectively. *See also* Joint Pretrial Memorandum (docket No. 8728) filed on February 27, 1989, sec. III.

52. *See* Order Nos. 139 (docket No. 7686, filed on January 20, 1989), 208 (docket No. 11869, filed on July 7, 1989) and 243 (docket No. 14576, filed on May 11, 1990), respectively.

53. This litigation was divided into several trial phases primarily due to the varied and myriad legal theories applicable to the many claims pursued.

54. As to the effect of the Phase I Trial, since it ended in settlement, the insureds allege that they need only show that the settlement was reasonable and the result of good faith negotiations.

they contend that ambiguities arise because the terms "loss of" and "direct damage", as used in the Central National Insurance Co. of Omaha (Central) policy definition of "property damage" are not defined; that the definition of "property damage" contained in the Fireman's Fund Insurance Co. (Fireman's) policy and several others contains the phrase "at any time;" and, that the policy issued by Protective National Insurance Co. (Protective) provides no definition for "property damage" or "is so ambiguous as to be of no help in the analysis." [55]

The insurers indicate that many of the twenty-three (23) pre-fire insurance policies contain the following definition of property damage provided in the Central policy: [56]

> Loss of or direct damage to or destruction of property (other than property owned by the Named Insured) which occurs during the policy period, including loss of use thereof at any time resulting therefrom.

The insureds rely on the following analysis to support their argument: 1) the phrases "loss of" and "direct damage" are inherently ambiguous, and 2) the "loss" and "direct damage" occurred with each act of the Dupont Entities which made the Hotel "unfit" or "defective." [57] Because this circular reasoning does not provide the two or more reasonable definitions of the terms warranted by this analysis, the Court will utilize the common meaning of the terms contained in the policy to determine if the scope of coverage would encompass the acts alleged.

Consulting Chambers English Dictionary, 7th Ed., W & R Chambers Ltd. and Cambridge University Press at 357 (1988), "damage" is defined as: "hurt, injury, loss: the value of what is lost: cost: the financial reparation due for loss or injury sus-

tained by one person through the fault or negligence of another ... **direct** or **general damages** awarded for the immediate consequences of a hurt as distinct from **indirect** or **special damages** turning on the remoter consequence." (emphasis added). "Loss" is defined as: "losing: diminution: default: bereavement: destruction: defeat: deprivation: detriment: that which is lost." *Id.* at 845.

Applying these common meanings to the terms "loss" and "direct damage" does not serve to expand the definition of property damage in the policy to encompass coverage for damages resulting *after* the expiration of the policy period where the alteration of the Hotel and the installation of particular products occurred *during* the policy period. The Court finds that immediate damages and loss did not result as a consequence of the complained-of acts because when the entire policy is read in conjunction with the aforementioned definitions, it is clear that the contract terms warrant that property damage must occur *during* the policy period for coverage to be triggered.

A number of other insurance policies contain the definition of "property damage" found in the Fireman's policy, as follows: [58]

> (1) Physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Contrary to the insureds' contentions, the Court finds that the phrase "at any time" is not unclear when considered within the context of the provision. [59] The defi-

---

**55.** *See* docket No. 16695, pp. 7–11.

**56.** Central issued policies on January 1, 1983 through January 1, 1984 (CNU 00–13–63) and December 1, 1981 through January 1, 1983 (CNU 18–83–04).

**57.** *See* docket No. 16695, p. 9.

**58.** Fireman's Fund Insurance Co. issued January 1, 1978 through January 1, 1979 (XLB–128–24–05). Although this insurer settled prior to the issuance of these rulings, the language contained therein shall be used for analysis as other pre-fire policies contain the same language.

**59.** It is important to note that when the Dupont Entities included this definition of property

nition conclusively states that the physical injury or the destruction of tangible property has to occur within the policy period and should the loss of use result from these acts at any time thereafter due to that injury or destruction, coverage is provided. Even when interpreting this provision broadly so as to encompass loss of property use "at any time" to mean beyond the policy period, coverage is not available because the physical injury or destruction of property did not occur during the policy period.

■ Finally, even though the Protective policy does not contain a definition of "property damage," the policy does include numerous provisions identifying the types of property damage excluded as well as several endorsements expanding coverage. The Dupont Entities have failed to cite, nor has the Court located, support for the conclusion that the failure to define property damage within an insurance policy creates an ambiguity per se which results in an automatic finding for the insured. When the policy is read in its entirety, it is clear that coverage will only be found in the event that an occurrence takes place during the policy period. This condition is not rendered ineffective merely because the policy fails to contain a definition of property damage.

■ The final argument pursued by the insureds regarding the property damage claims is that coverage under the pre-fire policies was triggered by the acts of the various entities, i.e., defective design and alteration of the Hotel and installation of "hazardous" products, which resulted in immediate and continuous property damage rendering the Hotel "unfit for its intended use." [60] In response, the insurers rely on the occurrence provision which limits coverage for those injuries and damages which arise during the policy period.[61] Asserting that actual damages did not arise until the December 31, 1986 fire, the insurers conclude that coverage is not available pursuant to the provisions contained in the pre-fire policies.[62]

The insurers' position is supported by the most recent decision issued by the Supreme Court of Puerto Rico on this subject, *Albany Insurance Co. v. Compañia de Desarrollo Comercial de Puerto Rico*, 90 JTS 19 (1990) (in a policy providing comprehensive general liability insurance, the determining date for purposes of coverage is not when the negligent act was committed but when the injury was sustained). Furthermore, as the insurers correctly indicate, the application of California law would yield the same conclusion. See *Maples v. Aetna Casualty & Surety Co.*, 83 Cal.App.3d 641, 148 Cal.Rptr. 80, 82 (1978) (the general and well established rule provides that the occurrence in an indemnity policy is the time that the complaining party was damaged rather than when the wrongful act was committed) (citing *Remmer v. Glenn Falls Indemnity Co.*, 140 Cal.App.2d 84, 295 P.2d 19, 21 (1956)).

The triggering event for coverage in an occurrence policy has been the subject of

damage in their brief, they incorrectly quoted the policy omitting the portion: "the policy period, including the" immediately after "destruction of tangible property which occurs during ..." See docket No. 16695, p. 10.

60. The insureds also contend that the value of the Hotel has diminished as a result of these acts. They conclude, however, that the lessened value is not property damage in and of itself but, rather, a measurement of the damages. See docket No. 16695, p. 18, and cases cited therein.

61. The definition of occurrence most frequently used in these policies mirror that of the Safety Mutual and Fireman's policies which is as follows:

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the insured.

Additionally, the definition is found in the Central policy varies slightly:

The term "occurrence" means an accident or a happening or event or a continued and repeated exposure to conditions which unexpectedly or unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence.

62. See Brief of Pre-fire Insurers in Response to Dupont Defendants' Property Damage Claims ... (docket No. 16739), filed on May 17, 1991.

many disputes and, therefore, of numerous judicial decisions and treatises. The general principles have been summarized as follows:

> An accident which ... represents a risk covered by a policy of liability insurance is not covered if it occurs either before or after the period of coverage under the policy ... no liability exists if the accident or injury occurs outside the time period of coverage of a liability policy ...
>
> It appears to be well settled that the time of the occurrence of an accident within the meaning of a indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged ... [t]his rule has been applied to liability policies without distinction ...
>
> [C]learly there is not coverage for injury after the policy period terminated even if it arises out of work performed during the policy period ...

11 Couch, *supra* § 44:8 (1982) (citations omitted). An "occurrence" policy provides coverage if the event insured against as well as the subsequent injury takes place within the policy period. Generally, the time of the occurrence is the time that the claimant is injured rather than when the act or omission which caused such damage is committed. Richard C. Tinney, Annotation, *Event as Occurring Within Period of Coverage "Occurrence" and "Discovery" or "Claims Made" Liability Policies,* 37 A.L.R.4th § 3 (1990).

In an attempt to distinguish the facts of this case to support a finding that coverage was triggered during the pre-fire policy periods and thereby extend coverage beyond the policy expiration dates, the insureds contend that the alleged negligent acts of the Dupont Entities during the policy periods constituted an "occurrence" resulting in continuing and ongoing property damage. The insureds point to the following provision which appears in the Central policy as well as in several other policies to support the contention:

> In the event property damage arising out of an occurrence covered by the policy is continuing at the time of termination of the policy the Company will continue to protect the insured for liability in respect of such property damage.

There are various decisions that have established coverage where the actual injury occurred during the policy period but the damages, though considered ongoing, did not manifest themselves until the policy period had expired. These cases are not at odds with the general rule discussed above but merely stand for the proposition that the *timing* of the injury may not always coincide with the ultimate damage emanating therefrom. The fact situations in these cases are discrete in that the injury was continuing or repeated or part of an ongoing process which began with an occurrence during the policy period and continued thereafter.

The insureds allege that the facts before the Court are identical to the circumstances in *Dayton Independent School District v. National Gypsum Co.,* 682 F.Supp. 1403 (E.D.Texas 1988), *rev'd sub nom. W.R. Grace & Co. v. Continental Casualty Co.,* 896 F.2d 865 (5th Cir.1990).[63] There, the Court found that installation of asbestos resulted in property damage which was immediate and continuous and which triggered coverage of the policy in force at the time of the installation, as well as that of other insurance policies issued subsequently, until the asbestos was removed or contained. *See also, Lac D'Amiante Du Quebec, Ltee. v. American Home Assurance Co.,* 613 F.Supp. 1549 (D.N.J.1985) (the installation of building materials containing asbestos results in a continuous and ongoing injury to property and all policies issued from the time of installation until the time of removal and/or containment are

---

**63.** As the insurers point out, the Dupont Entities failed to include the full citation in its brief. Upon reversing the decision below for lack of subject matter jurisdiction, the Circuit Court criticized the lower court's finding that the installation of asbestos constituted property damage since New York State Courts had yet to resolve this issue. *W.R. Grace & Co.,* 896 F.2d at 875.

jointly and severally liable for the property damage.[64]

The case at bar is easily distinguishable from those where property damage is immediate upon the installation of building materials containing asbestos. As indicated by *Lac D'Amiante*, 613 F.Supp. at 1561,[65] it is widely known and accepted that the natural deterioration of materials containing asbestos results in a slow and continual release of fibers which are air born and which may be accelerated by the air movement and vibrations which normally occur in buildings. There was no such danger created in the Hotel by the alteration of the casino or the installation of the various products to trigger property damage coverage during the years prior to the fire.

The particular circumstances of this case are also distinguishable from the facts presented in other cases cited by the insureds. For example, *see Liberty Mutual Insurance Co. v. Those Certain Underwriters at Lloyds*, 650 F.Supp. 1553, 1557–59 (W.D.Pa.1987) (for purposes of coverage, the timing of the occurrence is when the injury or damages derived from the occurrence manifests itself, therefore, where the occurrence is the implementation of discriminatory employment practices, the injury first manifested itself at the time of implementation and coverage was provided for the claims of all employees whether hired subsequent to implementation and once the insurance policy expired); *California Union Insurance Co. v. Landmark Insurance Co.*, 145 Cal.App.3d 462, 193 Cal.Rptr. 461 (1983) (coverage was found where the defective installation of a pool resulted in continuous leakage of the water lines and the exact cause and the full extent of the damage was not known until the insurance policy expired); *Snapp v. State Farm Fire & Casualty Co.*, 206 Cal. App.2d 827, 24 Cal.Rptr. 44 (Cal.App.1962), *modified*, 60 Cal.2d 816, 36 Cal.Rptr. 612, 388 P.2d 884 (1964) (insurer's liability for a continuing peril is not eradicated by the termination of the policy period where property damage resulted from a landslide due to unstable landfill and heavy rainfall); *Gruol Construction Co., Inc. v. Insurance Co. of North America*, 11 Wash.App. 632, 524 P.2d 427 (1974) (the occurrence was found to have been continuing spanning three policy periods and all insurers were found to be jointly and severely liable for damage caused by dry rot from dirt piled against the building's box sills by backfilling during construction).

The Court finds that acts of the Dupont Entities, i.e., alteration to the Hotel and the purchase and installation of various products, do not constitute property damage which is "continuing" within the meaning of these policy provisions as demonstrated by the case law relied upon by the insureds. Although these actions may have taken place during the policy periods, these acts by themselves, did not render the Hotel unfit for its intended use; rather, they created a risk which could not by itself cause the actual property damage. Another causative event or occurrence was required, i.e., a fire resulting in property damage that may have triggered coverage. Since the fire took place after these policies had elapsed, coverage under the pre-fire policies is not available for the Dupont Entities' property damage claims and these claims are hereby DISMISSED.

---

**64.** Other cases relied upon by the insureds have no effect upon resolution of the issue before the Court. *See, e.g., Triple U. Enterprises, Inc. v. New Hampshire Insurance Co.,* 576 F.Supp. 798, 807 (D.S.D.1983), *modified,* 766 F.2d 1278 (8th Cir.1985) (the insurer had a duty to defend where the current insurance policy provided coverage for "physical injury ... to tangible property" and damaged calves were born after the purchase and use of unfit breeding stock); *American Motorists Insurance Co. v. Trane Co.,* 718 F.2d 842 (7th Cir.1983) (potential coverage under a current insurance policy existed so as to support a duty to defend where the definition of property damage included "loss of use" of "tangible property" and the use of faulty heat exchangers resulted in the plant operating at less than full capacity).

**65.** The case cites the *Guidelines for Assessment and Abatement of Asbestos-Containing Material in Buildings,* United States Department of Commerce, National Bureau of Standards, Center for Buildings Technology, May 1983, prepared by the General Services Administration, Office of Design and Construction, Public Buildings Service, No. NBSIR 83–2688, at 233.

### E. Personal Injury Claims

■ Claims for personal injury [66] are alleged against the St. Paul Fire and Marine Insurance Co. (St. Paul Fire) [67] and St. Paul Mercury Insurance Co. (St. Paul Mercury) [68] pursuant to a general liability broadening endorsement.[69] These policies do not contain advertising injury coverage; instead, coverage is based upon injuries arising from the utterance or publication of erroneous information which, the Dupont Entities allege, constitute libel, slander or invasion of privacy.[70]

The St. Paul Fire and the St. Paul Mercury policies contain the same broadening endorsement,[71] which reads in pertinent part:

> This Company will pay on behalf of the insured all sums which the Insured shall be legally obligated to pay as damages because of injury (hereinafter called personal injury) sustained by any person or organization arising out of one or more of the following offenses committed in the conduct of the Named Insured's business:
>
> Group B—The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individuals' right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the Named Insured ...

According to the insureds, information was transmitted to financial institutions which erroneously represented that HCC or the Grand Hotel Associates were the Hotel owners and/or financially responsible for its debts. In addition, they allege that documents and business cards were distributed by HSI linking Grand Hotel employees to the Hotel.[72] This evidence was used by the PSC during the Phase I Trial to support plaintiffs' claims of corporate liability of the Dupont Entities.

The insureds argue that several Courts have held that "claims for wrongful impairment of credit against a credit collection agency fall under 'personal injury' coverage," relying on *Collection Bureau of Orlando, Inc. v. Continental Casualty Co.*, 342 So.2d 1019 (Fla.App.1977) and *Saavedra Martínez v. Joyerías Gordon, Inc.*, 88

**66.** Although this portion of the discussion primarily focuses on the provisions contained in the St. Paul Fire and St. Paul Mercury policies, other pre-fire policies include this type of coverage as well as advertising injury liability.

**67.** These include policy Nos. 681 NA 7458, issued to the Dupont Plaza Associates for coverage during 1978 through 1981 and policy No. 659 NA 6331, issued to HCC, HSI and HSI Reservations for coverage beginning in 1981 through 1984. While this party was added to the Fourth Amended Master Complaint, the PSC had omitted the policy number for the later policy which was subsequently added by Motion to Amend the Fourth Amended Master Complaint by Interlineation; *see* docket No. 13610 and Order No. 594 (docket No. 13793).

**68.** These include policy Nos. 659 NA 4404 and 659 NA 6199 issued to the Grand Hotel for policy periods 1978 through 1981, and 1981 through 1984, respectively. The PSC had mistakenly identified these policies as issued by St. Paul Fire when requesting to add the specific policy numbers in a Motion to Amend the Fourth Amended Master Complaint by Interlineation; *see* docket Nos. 13610 & 13748.

**69.** Initially, the PSC also alleged claims against St. Paul for 1986 excess policies; however, those claims were later withdrawn. *See* docket No.

16702, filed on May 10, 1991 and Court Margin Order No. 810 (docket No. 18055) filed on June 22, 1992.

**70.** The St. Paul policies at issue do not contain coverage for advertising injury. However, the insureds allege that if St. Paul is found to provide coverage for the personal injury claims alleged, then the excess policies that follow will also be found to have coverage for personal injury. In effect, the excess policies may provide coverage under both advertising and personal injury provisions although, as conceded by the insureds, double recovery is not allowed. *See* PSC's Opposition to Insurance Defendants' Motion to Dismiss Fourth Amended Complaint ... (docket No. 13562), filed on January 10, 1990, p. 55.

**71.** *See* St. Paul Fire's Reply to Supplemental Memorandum of HCC ... (docket No. 14477), filed on April 30, 1990, p. 23.

**72.** Arguments supporting coverage for personal injury are first articulated in docket No. 13562, pp. 46–56. *See also* PSC's Response to St. Paul Fire's Motion for Summary Judgment (docket No. 14363) April 17, 1990.

JTS 24 (1988), and that "business related tort[s] fall within personal injury coverage," relying on *Ruder & Finn*, 52 N.Y.2d 663, 439 N.Y.S.2d 858 422 N.E.2d 518 (1981) and *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal.App.3d 598, 222 Cal.Rptr. 276 (1986).[73] Assuming that pursuant to these cases, the insureds' acts fall within the scope of personal injury liability as defined by the policy provisions, the insureds must still show, as in any other occurrence policy, that the occurrence and the injury arising therefrom took place during the policy period.

To meet this requirement, the insureds initially relied upon *Saavedra Martinez*, where the Supreme Court of Puerto Rico found that a company's negligent reporting of erroneous credit information in 1979, which resulted in the denial of an application for financing five years later, was not covered by a 1984 insurance policy because an insurer-insured relationship did not exist at the time of the wrongful act. The Supreme Court found the date of the negligent act to be determinative. This decision, however, was reversed in *Albany Insurance Co.*, where the Court ruled that "[i]t is the date when the harm is sustained which is significant when determining whether liability arises, even though such harm is the consequence of earlier actions...." 90 JTS 19, at 7438 (quoting 11 Couch, *supra* § 44.256). Accordingly, the Puerto Rico Supreme Court has adopted the position that an act alone, without concurrent damage, is no longer sufficient to trigger coverage under a comprehensive liability policy.[74]

To refute this analysis, the Dupont Entities argue that because the additional coverage provided by the broadening endorsement contains no time limitation as to when the personal injuries must occur and because the personal injury is not contained in the definition of occurrence, coverage is triggered by the act rather than by the incidence of an injury or damage.[75] After a review of all provisions contained in the policy, the Court finds that "personal injury" liability is subject to the same policy limitations as "property damage" and "bodily injury" liability. The language of the broadening endorsement clearly indicates that coverage for personal injury liability is merely a modification of coverage for these two other types of injuries already defined within the policy provisions.[76] Thus, the broadening endorsement states as follows: "[n]othing herein shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements, or limitations of the above mentioned Policy other than as stated above."

As indicated, damage must occur during the policy period in order to trigger personal injury coverage. Although it may be said that the personal injury claims resemble claims for advertising injury, the triggering event for personal injury under these policies is tied to an occurrence which results in damage or injury during the policy period.[77] Indeed, the Court finds that coverage under the personal injury provi-

---

73. *See* docket No. 13562, p. 48.

74. This is later conceded by the insureds; *see* HCC, HSI and DPA's Supplemental Memorandum of Recent Decision ... (docket No. 14141), p. 4.

75. *See* PSC's Response to St. Paul Fire's Motion for Summary Judgment ... (docket No. 14363), pp. 9–10.

76. The policies contain the following definitions:
 "Bodily Injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;
 "Property Damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss or use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

77. In addition, Dupont Plaza Associates, a named insured in St. Paul Fire policy No. 681 NA 7458, appears to allege that coverage can be found pursuant to the "product hazard" and "completed operations" provisions also contained in the broadening endorsement which read:
 "Completed Operations Hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations

sions of the pre-fire policies is not triggered even though the utterances or publication were made during the policy period, because damages were not manifest until long after the policies at issue had lapsed. Therefore, these personal injury claims are hereby DISMISSED.[78]

## VII. CONCLUSION

It appearing that no genuine issue of material fact exists and that plaintiffs' and the insureds' claims against the pre-fire policies warrant dismissal, the Court rules as follows:

1) The Court has subject matter jurisdiction over the claims involving coverage determination of pre-fire policies;

2) Plaintiffs' claims against the pre-fire insurers are not colorable under the direct action statute;

3) Absent an assignment of claims, the plaintiffs do not have standing to pursue claims against the pre-fire insurers in this action;

4) The purported acts of the Dupont Entities during the pre-fire years do not trigger coverage pursuant to any of the pre-fire insurance policies' advertising injury, property damage, personal injury, completed operations hazard and product hazard clauses.

Therefore, the insurance claims asserted by plaintiffs and the Dupont Entities against the pre-fire insurers[79] are hereby DISMISSED pursuant to Rule 56(c) of the Fed.R.Civ.P.

Judgment to be entered accordingly.

IT IS SO ORDERED.

ORDER NO. 467
TABLE OF CONTENTS

DISMISSAL OF CLAIMS
AGAINST THE PRE–FIRE INSURERS

I. BACKGROUND/INTRODUCTION ........................................ 2
II. SUBJECT MATTER JURISDICTION ...................................... 6
III. NOTICE REQUIREMENT/CLAIM FILED .............................. 12
IV. PSC'S DIRECT ACTION CLAIMS ...................................... 16
V. PSC'S STANDING AND ASSIGNMENT OF CLAIMS..................... 18
VI. COVERAGE ...................................................... 23
 A. Policy Interpretation............................................. 23
 B. Summary Judgment Standard...................................... 25
 C. Advertising Liability Claims ...................................... 26
 D. Property Damage Claims .......................................... 39
 E. Personal Injury Claims ........................................... 52
VII. CONCLUSION .................................................... 58

have been completed and abandoned and occurs away from premises owned and operated by or rented to the Named Insured;

"Product Hazard" includes bodily injury and property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from the premises owned or rented to the Named Insured after physical possession of such products has been relinquished to others.

The argument presented fails to allege any facts showing that the insureds' were in the position to cause such harm as in the case of a contractor or a product manufacturer, to support coverage claim pursuant to these provisions. *See* DPA's Opposition to St. Paul Fire's Motion to Dismiss ... (docket No. 12688), filed

on September 22, 1989, pp, 22–24 and St. Paul Fire's Motion for Summary Judgment ... (docket No. 13109), filed on November 20, 1989, pp. 23–28. Furthermore, the findings herein limiting coverage for personal injury are equally applicable to coverage pursuant to these provisions. Therefore, it is not necessary to consider this claim further.

**78.** The insurers provide numerous arguments to support their position that coverage does not exist for personal injury under these pre-fire policies. However, in view of the discussion above which effectively disposes of the issue, the Court will not review each allegation set forth by St. Paul Fire. *See* docket Nos. 12572, 12713, 12887, 14024, 14477, 14537, 14692.

**79.** *See supra* note 3.

APPENDIX TO ORDER NO. 467

| | DOCKET NO. | DATE FILED | TITLE |
|---|---|---|---|
| 1. | 12119 12120 | 8/07/89 | First State Insurance Company's Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint of Holders Capital Corp., Hotel Systems Int'l. and Dupont Plaza Assoc. and Memorandum of Law in Support. |
| 2. | 12331 12333 | 8/18/89 | Insurance Company of North America's Motion for Judgment on the Pleadings against Holders Capital Corp., HSI and Dupont Plaza Assoc. and Memorandum of Law in Support. |
| 3. | 12386 | 8/21/89 | Holders Capital Corporation and HSI Opposition to First State Insurance Company's Motion to Dismiss the Amended Third Party Complaint, Request for Sanctions and Request for Oral Argument, with Exhibit A attached. |
| 4. | 12402 | 8/23/89 | PSC's Response in Opposition to First State Insurance Company and Fireman's Fund Insurance Company's Motion to Dismiss the Amended Cross–Complaint (re: docket Nos. 12093 and 12120). |
| 5. | 12502 | 9/01/89 | Highlands Insurance Company's Notice of Motion and Motion to Dismiss the Amended Cross–Complaint and Third Party Complaint for Declaratory Relief of HCC, HSI and Dupont Plaza Associates. |
| 6. | 12509 | 9/05/89 | Holders Capital Corporation and HSI Opposition to the Motion for Judgment on the Pleadings of Insurance Company of North America and Request for Oral Argument. |
| 7. | 12571 12572 | 9/08/89 | St. Paul Fire and Marine Insurance Company's Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint for Declaratory Relief Filed by HCC, HSI and Dupont Plaza Associates, or in the Alternative, for a More Definite Statement and Memorandum of Law in Support. |
| 8. | 12632 | 9/12/89 | First State Insurance Company's Response to HCC, HSI and Dupont Plaza Associates' Request for Sanctions and reply to Opposition of HCC, HSI and Dupont Plaza Associates to FSIC's Motion to Dismiss the Amended Third Party Complaint and Response to HCC and HSI Motion for Sanctions. |
| 9. | 12647 | 9/13/89 | First State Insurance Company's Reply to the PSC's Response in Opposition to First State Insurance Company and Fireman's Fund Insurance Company's Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint. |
| 10. | 12681 | 9/15/89 | Holders Capital Corporation and HSI's Opposition to the Motion of Highlands Insurance Company to Dismiss the Amended Cross–Complaint for Declaratory Relief and Request for Oral Argument. |
| 11. | 12684 | 9/21/89 | Holders Capital Corporation, HSI and Dupont Plaza Associates' Motion to Strike Reply of First State Insurance |

| DOCKET NO. | DATE FILED | TITLE |
|---|---|---|
| | | Company and for Sanctions, or in the Alternative, for Relief of Court to File a Surreply. |
| 12. 12688 | 9/25/89 | Dupont Plaza Associates' Opposition to St. Paul Fire & Marine Insurance Co.'s Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint for Declaratory Relief, or in the Alternative, for a More Definite Statement. |
| 13. 12689 12690 | 9/25/89 | First State Insurance Company's Motion to Dismiss Certain Claims of the Fourth Amended Revised Master Complaint and Memorandum of Law in Support. |
| 14. 12706b | 9/26/89 | Insurance Company of North America's Reply to Opposition of Holders Capital Corporation and HSI to the Motion for Judgment on the Pleadings of Insurance Company of North America. |
| 15. 12712 12713 | 9/27/89 | St. Paul Fire and Marine Insurance Company's Motion to Dismiss the Fourth Amended Revised Master Complaint or in the Alternative, for a More Definite Statement and Memorandum of Law in Support. |
| 16. 12777 | 10/2/89 | Federal Insurance Company's Motion for Judgment on the Pleadings Against Holders Capital Corporation, HSI and Dupont Plaza Associates. |
| 17. 12887 | 10/12/89 | St. Paul Fire & Marine Insurance Co.'s Memorandum of Law in Reply to Opposition of Dupont Plaza Associates to St. Paul's Motion to Dismiss. |
| 18. 12896 | 10/13/89 | Federal Insurance Co.'s Adoption and Incorporation of Motion for Judgment on the Pleadings Filed Against HCC, HSI and Memorandum of Law in Response to PSC's Fourth Amended Revised Master Complaint. |
| 19. 12968 | 10/27/89 | Holders Capital Corporation and HSI's Opposition to Federal Insurance Co.'s Motion for Judgment on the Pleadings and Request for Oral Argument. |
| 20. 12975 12976 | 10/27/89 | First State Insurance Co.'s Motion to Dismiss EBCO, Tertiary and Eberle's Amended Cross–Claims Against Insurers and other Defendants and Memorandum of Law in Support. |
| 21. 12977 12978 | 10/27/89 | First State Insurance Co.'s Motion to Dismiss HELA's Cross–Claims Against Insurers and Other Defendants and Memorandum of Law in Support. |
| 22. 12987 | 10/30/89 | Holders Capital Corporation and HSI's Surreply to Insurance Company of North America's Reply to Opposition of HCC and HSI to the Motion for Judgment on the Pleadings. |
| 23. 13063 13064 | 11/14/89 | International Insurance Company's Motion to Dismiss the Fourth Amended Revised Master Complaint and Memorandum of Law in Support. |
| 24. 13101 13102 | 11/20/89 | Central National Insurance Company of Omaha and Insurance Company of North America's Motion for Judgment on the Pleadings and/or Summary Judgment Against the PSC and Memorandum in Support. |

**654**

| | DOCKET NO. | DATE FILED | TITLE |
|---|---|---|---|
| 25. | 13103 | | |
| | 13104 | 11/20/89 | California Union Insurance Co. and Pacific Employers Insurance Co.'s Motion for Judgment on the Pleadings |
| 26. | 13107 | 11/20/89 | St. Paul Fire & Marine Insurance Co.'s Motion to Dismiss the Cross–Claims of EBCO, Inc., Tertiary, Inc. and William D. Eberle. |
| 27. | 13108 | 11/20/89 | St. Paul Fire & Marine Insurance Co.'s Motion to Dismiss the Cross–Claim of HELA. |
| 28. | 13109 | 11/20/89 | St. Paul Fire & Marine Insurance Co.'s Motion for Summary Judgment and Memorandum of Law. |
| 29. | 13112 | 11/20/89 | Highlands Insurance Co.'s Not of Motion for Judgment on the Pleadings on the Fourth Amended Revised Master Complaint. |
| 30. | 13114 | | |
| | 13115 | 11/20/89 | Highlands Insurance Co.'s Motion Joining First State's Motion for Judgment on the Pleadings or in the alternative, Summary Judgment as to the Fourth Amended Revised Master Complaint and the Cross Claims of HCC, et al. and Memorandum in Support. |
| 31. | 13119 | | |
| | 13120 | 11/20/89 | First State Insurance Co.'s Motion for Judgment on the Pleadings or in the Alternative Summary Judgment as to Certain Claims of the Fourth Amended Revised Master Complaint and the Cross–Claims of HCC, HSI, Dupont Plaza Associates, EBCO, William Eberle, Tertiary and HELA and Memorandum in Support. |
| 32. | 13202 | 11/27/89 | Dupont Plaza Associates' Surreply to St. Paul Fire & Marine Insurance Co.'s Memorandum of Law in Reply to Opposition of Dupont Plaza Associates to St. Paul's Motion to Dismiss. |
| 33. | 13340 | 12/12/89 | Dupont Plaza Associates' Motion to Strike St. Paul Fire & Marine Insurance Co.'s Motion for Summary Judgment (13109) or in the Alternative, for Leave to file Response. |
| 34. | 13361 | 12/14/89 | Holders Capital Corporation, HSI and Dupont Plaza Associates' Opposition to First State Insurance Co.'s Motion for Judgment on the Pleadings or in the Alternative Summary Judgment. |
| 35. | 13446 | 12/26/89 | EBCO, Tertiary, William Eberle and HELA's Motion for Permission to file Amended Cross–Claims (12832, 12832, filed 10/05/89), Opposition to Motion to Strike filed by Insurance Company of North America (13001, 13002, filed 10/31/89) and Opposition to Motion to Dismiss of St. Paul Fire & Marine Insurance Co. (13107, 13109, filed 11/20/89). |
| 36. | 13465 | 12/27/89 | Holders Capital Corporation, HSI and Dupont Plaza Associates' Notice of Stay in California State Court. |
| 37. | 13525 | 1/05/90 | First State Insurance Co.'s Reply to the Opposition of Holders Capital Corporation, HSI and Dupont Plaza Associates to First State Insurance Co.'s Motion for Judgment on the Pleadings or in the Alternative, Summary Judgment. |

| | DOCKET NO. | DATE FILED | TITLE |
|---|---|---|---|
| 38. | 13556 | | |
| | 13557 | | |
| | 13558 | | |
| | 13559 | 1/10/90 | Dupont Plaza Associates' Opposition to St. Paul Fire & Marine Insurance Co.'s Motion for Summary Judgment; Notice of Filing courtesy copies of Authorities cited; Separate Statement of Facts Supporting the Opposition and Declaration of Dennis Jay. |
| 39. | 13562 | 1/10/90 | PSC's Opposition to Insurance Defendants' Motion to Dismiss Fourth Amended Complaint, with Attachments. |
| 40. | 13620 | 1/16/90 | Holders Capital Corporation and HSI's Surreply to First State Insurance Co.'s Reply to Opposition of HCC and HSI to the Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint. |
| 41. | 13622 | 1/16/90 | Insurance Co. of North America, etc., Reply in Support of Their Motion to Strike the Amended Cross Claims Filed by EBCO, Tertiary, Eberle & HELA. |
| 42. | 13684 | 1/22/90 | Holders Capital Corporation and HSI's Surreply to First State Insurance Company's Reply to Opposition of Holders and HSI to First State Insurance Co.'s Motion for Judgment on the Pleadings or in the Alternative, Summary Judgment. |
| 43. | 13726 | 1/29/90 | California Union Insurance Co., et al.'s Notice of Filing Under Seal the Supplement to Reply in Support of their Motions for Judgment on the Pleadings and/or Summary Judgment Against the PSC. |
| 44. | 13728 | 1/29/90 | California Union Insurance Co., et al.'s Reply in Support of their Motions for Judgment on the Pleadings and/or Summary Judgment Against the PSC. |
| 45. | 13739 | 1/30/90 | First State Insurance Co.'s Reply to the PSC's Opposition to First State Ins. Co.'s Motion for Judgment on the Pleadings and/or in the Alternative Summary Judgment. |
| 46. | 13747 | 1/31/90 | St. Paul Fire & Marine Insurance Co.'s Reply to the Opposition of Dupont Plaza Assoc. and PSC to St. Paul's Motion for Summary Judgment. |
| 47. | 13758 | 2/01/90 | First State Insurance Co.'s Motion to Strike the Surreply of HCC and HSI to First State Ins. Co.'s Reply to the Opposition of HCC and HSI to the Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint. |
| 48. | 13803 | 2/07/90 | First State Insurance Co.'s Sur-surreply of First State Insurance Co. to the Surreply of HCC and HSI to First State's Reply to HCC and HSI Opposition to First State's Motion for Judgment on the Pleadings or in the Alternative Summary Judgment. |
| 49. | 13892 | 2/15/90 | Federal Insurance Co.'s Motion Informing Additional Precedent of February 6, 1990. |
| 50. | 14012 | | |
| | 14013 | 3/05/90 | The Protective National Insurance Co. of Omaha's Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint of HCC, HSI and Dupont Plaza Associates and Memorandum of Law in Support. |
| 51. | 14015 | 3/05/90 | Insurance Company of North America, California Union Insurance Co., Pacific Employers Insurance Co. and California Union Insurance Co.'s Informative Motion Attaching New Puerto Rico Decision in Support of Pre–Fire Insurers' Motion to Dismiss and/or for Judgment Against the PSC and certain Dupont Defendants. |

| | DOCKET NO. | DATE FILED | TITLE |
|---|---|---|---|
| 52. | 14024 14025 | 3/06/90 | St. Paul Fire & Marine Insurance Co.'s Motion and Memorandum of Law for Summary Judgment on the New Insurance Policies Raised in PSC's Motion Requesting Leave to Amend Master Complaint by Interlineation. |
| 53. | 14059 | 3/09/90 | Highlands Insurance Co.'s Reply in Support of its Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint for Declaratory Relief of HCC, HSI and Dupont Plaza Associates. |
| 54. | 14074 14075 | 3/12/90 | Insurance Company of North America, California Union Insurance Co., Pacific Employers Insurance Co., Central National Insurance Co. of Omaha's Motion to Dismiss the Amended Cross–Claims filed by EBCO, Inc., Tertiary, Inc., W. Eberle and HELA and Memorandum in Support. |
| 55. | 14100 | 3/15/90 | PSC's Surreply to California Union, et al (13728), First State Insurance Co. (13779), St. Paul Fire & Marine (13747) and Response to Motions Informing the Court of Recent P.R. Supreme Court Case (13992, 13988 and 14015). |
| 56. | 14101 | 3/16/90 | Puerto Rican American Insurance Co.'s Request for Summary Judgment and Joinder in other Motions with Attachment. |
| 57. | 14140 14141 | 3/20/90 | Holders Capital Corp., HSI and Dupont Plaza Assoc.'s Separate Statement of Facts Supporting Memo. of Holders Capital Corp., HSI and Dupont Plaza Associates Re: Recent Decision of the Supreme Court of Puerto Rico and Supplemental Memorandum. |
| 58. | 14191 | 3/26/90 | Holders Capital Corp.'s Motion to Strike Puerto Rican American Insurance Co.'s Request for Summary Judgment and Joinder in other motions. |
| 59. | 14242 | 4/03/90 | Holders Capital Corp., HSI and Dupont Plaza Assoc.'s Surreply to the Reply of Highlands Insurance Co. in Support of its Motion to Dismiss the Amended Cross–Complaint and Third–Party Complaint for Declaratory Relief (14059) with attachment. |
| 60. | 14245 | 4/03/90 | California Union Insurance Co., Pacific Employers Insurance Co., Central National Insurance Co. of Omaha and Insurance Co. of North America's Surrebuttal to the PSC's Surreply to Insurers Motions for Judgment on the Pleadings and/or Summary Judgment Against the PSC. |
| 61. | 14255 | 4/04/90 | St. Paul Fire & Marine Insurance Co.'s Sur-surreply to PSC's surreply (14100) to its Reply to PSC's Opposition to its Motion for Summary Judgment. |
| 62. | 14275 | 4/09/90 | Insurance Co. of North America's Rebuttal to Supplemental Memo. of HCC, HSI and Dupont Plaza Assoc. re: Recent Decision of the Supreme Court of P.R. |
| 63. | 14325 | 4/16/90 | EBCO, Inc., Tertiary, Inc., HELA and William D. Eberle's Opposition to Insurers' Motion to Dismiss Cross Claims (14075). |
| 64. | 14363 | 4/17/90 | PSC's Response to St. Paul Fire & Marine's Motion for Summary Judgment (14024). |
| 65. | 14400 | 4/20/90 | Insurance Co. of North America, California Union Insurance Co., Pacific Employers Insurance Co. and Central National Insurance Co. of Omaha's Motion to Strike the Untimely Opposition to Insurers' Motion to Dismiss |

| DOCKET NO. | DATE FILED | TITLE |
|---|---|---|
| | | Cross–Claims of EBCO, Inc., Tertiary, W. Eberle and HELA. |
| 66. 14417 | 4/24/90 | Holders Capital, HSI and Dupont Plaza Associates' Reply to the Sur-rebuttal of Insurance Co. of North America to Supplement Memo. Re: Recent Decision of the Supreme Court of Puerto Rico (14275). |
| 67. 14473 | 4/30/90 | Insurance Co. of North America, California Union Insurance Co., Pacific Employers Insurance Co. and Central National Ins. Co. of Omaha's Opposition to Insurers' Motion to Dismiss Cross–Claim of EBCO, Inc., Tertiary, Inc., W. Eberle and HELA. |
| 68. 14477 | 4/30/90 | St. Paul Fire & Marine Insurance Co.'s Reply to the Supplemental Memo. of HCC, HSI and Dupont Plaza Assoc. re: Recent Decision of the Supreme Court of P.R. (14141). |